[No. D001918. Fourth Dist., Div. One. May 9, 1986.]

In re the Marriage of BETTY L. and JOHNNIE D. FOSTER.
JOHNNIE D. FOSTER, Appellant, v.
BETTY L. FOSTER, Respondent.

**COUNSEL**

James P. Clark for Appellant.

Edward W. McKinnon for Respondent.

**OPINION**

**KREMER, P. J.**—When Johnnie and Betty Foster's marriage was dissolved in 1978, the trial court awarded Betty a 43 percent community interest in Johnnie's military retirement benefits. Johnnie refused to pay Betty from his retainer pay and eventually voluntarily resigned from the Navy, thereby forfeiting his retirement benefits. In a later action challenging the original judgment's enforcement, the trial court awarded Betty arrears and made Johnnie a constructive trustee for the amount Betty would have monthly received from the pension had Johnnie not resigned. We find the award of

arrears proper. However, because Johnnie resigned, his pension never matured. Under the original judgment, Betty would have had no claim to immature benefits. Therefore, the trial court erred in making Johnnie a trustee of the same. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Johnnie enlisted in the United States Navy in October 1952 and married Betty approximately six months later. Johnnie actively served in the Navy until October 1976 when he transferred to the Fleet Reserve. At that time, he began receiving monthly retainer pay under 10 United States Code section 6330.

In April 1977 Johnnie and Betty separated and Johnnie thereafter petitioned to dissolve their marriage. In its order awarding the community property, the trial court provided: "Respondent is awarded her share of the Petitioner's retirement fund, 4 of 258/299, of [*sic*] 43% of the gross monthly amount to which Petitioner is entitled, and Petitioner is hereby ordered to make a Government allotment in Respondent's favor with the proper departments so that her share of said retirement will be paid directly to her."

Believing retainer pay was not part of his "retirement fund," Johnnie did not immediately register a government allotment to Betty. Seeking to enforce the property division, Betty brought the first of a series of contempt actions. On threat of contempt, Johnnie instructed the Navy Finance Center to initiate an allotment to Betty "[u]pon my release from service in the Naval Fleet Reserve and [placement] on the retirement list . . . ." Under 10 United States Code section 6331, Johnnie could first be placed on the retired list and subsequently receive retired pay in October 1982, the point at which he would have actively and inactively served for 30 years. In apparent reliance on Johnnie's instructions, payments were not made immediately and arrears accrued. In a later contempt proceeding, Johnnie was again ordered to initiate an allotment for immediate payments to Betty. He apparently did so, but later wrote another letter to cancel the payments.

In December 1980 Johnnie resigned from the Naval Fleet Reserve. By resigning, Johnnie forfeited his retainer pay and his vested right to receive retired pay upon reaching his 30th service anniversary. In his letter to the Secretary of the Navy, Johnnie stated he resigned "[d]ue to the State of California's obsessive desire that I share a portion of my Naval Fleet Reserve retainer pay with my ex-spouse as community property, and their relentless pursuit to keep me incarcerated, . . . ." His discharge became final on November 19, 1981.

In 1982 and 1983 Betty brought writs of execution to recover arrears. In opposition, Johnnie filed an order to show cause to quash a previous earnings withholding order and underlying writ of execution and a request for an accounting. After a hearing, the trial court denied Johnnie's request to quash the earnings withholding order and reaffirmed Betty's 43 percent share in Johnnie's gross retainer and retired pay. The court then determined Johnnie owed $12,639.14 for the period between the final dissolution judgment and his discharge and $13,606.06 plus 10 percent interest for the period from his discharge until the hearing. The trial court also imposed "a constructive trust on petitioner husband in the amount of 43% of his retirement fund ($523.31/month) to respondent wife as her community interest as found by and ordered by the trial court." Johnnie appeals from this order.

## DISCUSSION

### I

Relying on a Texas appellate decision, Johnnie contends his retainer pay is distinct from retired pay and is not an asset in which Betty can claim a community interest. Although the Texas Court of Civil Appeals in *Sprott v. Sprott* (1979) 576 S.W.2d 653, did indeed hold retainer pay was separate property, this is clearly not the law in California. In *In re Marriage of Mercier* (1975) 48 Cal.App.3d 775 [121 Cal.Rptr. 886], the Court of Appeal determined retainer pay under 10 United States Code section 6330 was community property and ordered its division under the same principles guiding the division on nondisability retirement pay. (*Id.*, at pp. 783-784.)

Moreover, the dissolution judgment in this case has long been final, and res judicata principles preclude Johnnie from relitigating the character of his retainer pay. (*In re Marriage of Thomas* (1984) 156 Cal.App.3d 631, 638 [203 Cal.Rptr. 58].) Johnnie cannot now attack collaterally that which he could have directly litigated in the original dissolution action. Thus, the trial court's award of arrears based on Betty's 43 percent community interest in Johnnie's retainer pay was proper. For reasons which we explain in the section following, the award of arrears must be limited to those accrued between the judgment of dissolution and Johnnie's discharge.

### II

Johnnie next contends the trial court, in the circumstances of this case, improperly imposed a constructive trust on Johnnie's forfeited retainer

pay and immature pension benefits. We find merit in this contention. Betty unquestionably shared a community interest in Johnnie's rights to retired and retainer pay earned during their marriage. (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 851-852 [126 Cal.Rptr. 633, 544 P.2d 961, 94 A.L.R.3d 164]; *In re Marriage of Fithian* (1974) 10 Cal.3d 592, 604 [111 Cal.Rptr. 369, 517 P.2d 449], disapproved on other grounds in *In re Marriage of Brown, supra,* at p. 851, fn. 14.) The trial court recognized this in awarding Betty "43% of the gross monthly [retirement fund] to which [Johnnie] is entitled, . . ." At the time of this judgment, Johnnie was already receiving retainer pay, and consequently the order effected an immediate transfer of a 43 percent share to Betty. In contrast, Johnnie's right to retired pay did not mature, that is, become unconditionally payable, until Johnnie's 30-year service anniversary. (10 U.S.C. § 6331.) Under the terms of the judgment, this benefit could not be immediately paid to Betty until that time. (*In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 426 [174 Cal.Rptr. 493, 629 P.2d 1].) By resigning, Johnnie divested his mature right to retainer pay and precluded his vested right to retired pay from maturing.[1] Unfortunately, the judgment here does not shield Betty from these contingencies. On this record, we cannot tell whether Betty originally attempted to protect her interest by valuing Johnnie's retirement benefits and subsequently cashing out her interest or seeking an in-kind community property distribution. (*In re Marriage of Skaden* (1977) 19 Cal.3d 679, 688 [139 Cal.Rptr. 615, 566 P.2d 249]; *In re Marriage of Brown, supra,* 15 Cal.3d at p. 848; *In re Marriage of Kasper* (1978) 83 Cal.App.3d 388, 391-392 [147 Cal.Rptr. 821].) However, what we can discern here is that by accepting an award of "43% of the gross monthly amount to which [Johnnie] is entitled," Betty also accepted the risk Johnnie's benefits may be divested or may never mature. (See *Berry* v. *Board of Retirement* (1972) 23 Cal.App.3d 757, 758-759 [100 Cal.Rptr. 549].) While we certainly cannot applaud Johnnie's motives or conduct, we find, under these circumstances, Betty's present position is no different than it would have been had Johnnie resigned for the most noble and humanitarian reasons or had in fact died or been courtmartialed. (10 U.S.C. § 856; see *In re Marriage of Brown, supra,* 15 Cal.3d at p. 842; 2 Markey, Cal. Family Law Practice and Procedure, Dissolution of Marriage, § 24.24, pp. 24-34.1; see, e.g., *Bensing* v. *Bensing* (1972) 25 Cal.App.3d 889 [102 Cal.Rptr. 255].) Arrears, therefore, can only be calculated for the period ending with Johnnie's discharge. Betty's remaining

---

[1]The court and both parties posit this proposition but cite no specific authority for it. As the issue is not contested, we accept the proposition for the purposes of this appeal. As we note subsequently, at least one document in evidence refers to a possible payment of "retired pay" even after resignation. If it should be demonstrated Johnnie has received or is receiving retirement benefits properly characterized as community property, these should be valued and Betty awarded a 43 percent share.

community interest in his retirement benefits, whatever that may be, was divested by Johnnie's voluntary resignation from the Fleet Reserve.

Betty counters she was harmed by Johnnie's unilateral control of his retirement benefits, and imposing a constructive trust for amounts she would have received absent his resignation is both equitable and just. ■ Betty is correct in noting our courts have scrupulously protected a former spouse's community property rights from the detrimental control of the other. For example, in California a spouse cannot defeat a former spouse's community interest in a pension by unilaterally electing a disability pension instead of a nondisability pension (*In re Marriage of Stenquist* (1978) 21 Cal.3d 779, 782-783 [148 Cal.Rptr. 9, 582 P.2d 96]) or by postponing retirement until sometime after pension eligibility has matured (*In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 423). Similarly, a spouse cannot convert a community interest in a pension to a joint and survivor annuity (*In re Marriage of Lionberger* (1979) 97 Cal.App.3d 56, 67-71 [158 Cal.Rptr. 535]) or unilaterally control redeposits to a retirement fund to change the character of the pension (*In re Marriage of Lucero* (1981) 118 Cal.App.3d 836, 842 [173 Cal.Rptr. 680]). ■ However, the protective principle evidenced in these cases does not apply with equal force here. Johnnie, by resigning, disadvantaged both Betty and himself. He has not, as in the above cases, somehow relabeled or shifted benefits to increase his share or augment his control over the pension. Most importantly, as discussed above, Betty has accepted the possibility of divestment. That this divestment comes by Johnnie's hand rather than the hand of fate or ill-fortune is of no consequence to Betty's community property rights. In these circumstances, Johnnie has not obtained the unjust advantage or enrichment which necessarily underlies a constructive trust. (Civ. Code, §§ 2223, 2224.) The trial court therefore erred in imposing such a remedy.

However, on this record we cannot discern with absolute certainty whether Johnnie has received, or continues to receive, postdischarge benefits which have a community character. Specifically, the December 7, 1981, letter from the Navy Reserve Personnel Center discharging Johnnie from naval service also states the Navy Finance Center will calculate "the amount of retired pay to which you are entitled." If it should be demonstrated Johnnie has received, or is still receiving, benefits properly belonging to the community, those benefits should be valued, and Betty awarded her 43 percent share.

### DISPOSITION

That portion of the order awarding Betty arrears for the period between the dissolution judgment and Johnnie's discharge is affirmed. The remainder

of the judgment is reversed. In the event Johnnie has received benefits which are community in nature, Betty's share of these benefits should be valued and awarded to her.

Work, J., and Butler, J., concurred.