[No. S038966. Apr. 10, 1995.]

In re the Marriage of JOHN H. and EDIE M. ELFMONT.
JOHN H. ELFMONT, Appellant, v.
EDIE M. ELFMONT, Respondent.

**COUNSEL**

Olsen & Olsen, Neil A. Olsen and Casey A. Olsen for Appellant.

Dennis R. Dubrow and Edward J. Horowitz for Respondent.

**OPINION**

**WERDEGAR, J.**—Under what circumstances should disability insurance benefits received by a husband after dissolution of the marriage be divided as community property? In *In re Marriage of Saslow* (1985) 40 Cal.3d 848 [221 Cal.Rptr. 546, 710 P.2d 346] (hereafter *Saslow*), where the insurance was purchased wholly out of community funds and payment of the benefits commenced during the marriage, we held benefits received after separation were community property, insofar as they were intended to provide retirement income, and separate property, insofar as they were intended to replace the disabled spouse's postdissolution earnings.

Here, although disability term insurance for the husband was purchased out of community funds during the marriage, payment of the benefits did not commence until 32 months after the parties' separation, during which time the husband had paid renewal premiums out of his separate property to keep the insurance in effect. As in *Saslow*, there was evidence the premium payments during the marriage were made with an intent to provide retirement income. It also appears the husband's physical condition at the time of separation might have precluded his continuing to enjoy comparable disability coverage without the automatic policy renewal rights that had been purchased by the community.

Under *Saslow*, however, we look to "the spouses' intent" not only "at the time the disability insurance was originally purchased," but also "at the times that decisions were made to continue the insurance in force rather than let it lapse" (40 Cal.3d at p. 861). In the present case, no evidence indicates the husband's decision to renew the insurance after the parties' separation, by paying premiums out of his separate property, was accompanied by any intent to provide community retirement income. Accordingly, proof that continuation of his disability coverage was dependent upon policy renewal rights purchased with premiums paid out of community funds would not establish any community property interest in the insurance proceeds. Decisions basing community property interests in term *life* insurance proceeds upon the community's purchase of policy renewal rights (e.g., *Biltoft* v. *Wootten* (1979) 96 Cal.App.3d 58 [157 Cal.Rptr. 581]) are distinguishable, because of differences between the respective purposes of life and disability insurance, and because interests in term life insurance do not depend upon the *Saslow* requirement that an intent to provide community retirement income accompany the premium payment for the term in which the proceeds become payable.

Here, the husband appealed from a judgment characterizing disability insurance proceeds as community property. The Court of Appeal reversed. We shall affirm the judgment of the Court of Appeal.

## I. FACTS AND PROCEDURAL BACKGROUND

John H. Elfmont (husband) and Edie M. Elfmont (wife) were married in 1975 and separated on May 1, 1987. They have a daughter born in 1978 and a son born in 1979. The present dissolution proceeding was commenced in August 1987.

Husband was born in February 1939. During the marriage he practiced medicine as an obstetrician and gynecologist. In 1977, he incorporated his medical practice, established a corporate pension and profit-sharing plan, and took out disability insurance that would pay $3,500 per month. The coverage under that policy was increased to $4,000 per month in 1980 and to $5,000 per month in 1983. In 1982 and 1984 he purchased two more policies, each for $2,000 per month, bringing the total benefits payable upon his disability to $9,000 per month. All of this disability coverage was in the form of three-month term insurance. Each policy guaranteed renewal upon timely payment of the renewal premium, but provided that, if the premium were not paid within the 31-day grace period following the expiration of any 3-month term, the policy would lapse. Before the parties' separation, all the premiums were paid out of community earnings.

At the time of separation, husband's medical practice was grossing about $450,000 per year and contributing almost $60,000 per year to the corporate retirement plan, which had a total value of approximately $600,000. After separation, husband kept the disability insurance in effect by paying the premiums out of his separate property.

In 1989 husband became disabled from a disorder of the lower back. He thereafter made arrangements to sell his medical practice, with a covenant not to compete, for $265,000. As of January 1, 1990, he applied for disability insurance benefits of $9,000 per month. The benefits became payable, after policy waiting periods, on February 1, 1990, under the larger ($5,000 per month) policy and on April 1, 1990, under the two smaller policies. Payment of the benefits is expected to continue indefinitely, so long as he remains unable to resume the practice of medicine.

At the trial to determine issues of property division and support, husband explained how his lower back disorder, for which he receives the benefits, interfered with his obstetrics practice. He described his disability as consisting of multilevel degenerative disc disease in the lower back, a compression fracture of the first lumbar vertebra, and osteoarthritis in the neck. He thereby related the disability to two separate incidents, one before, and the other after, the parties' separation.

Husband testified the first incident was brought to light, in 1985 or 1986, by CAT-scan (computerized axial tomography) findings showing a large herniated disc between the fifth lumbar and first sacral vertebrae on the left side. In hindsight, he traced the source of those findings to an occasion in 1980 or 1981 when he lifted his then two-year-old daughter off a coffee table. He knew at the time he had hurt his back, but did not then think the injury was significant. In written applications for increased disability insurance in 1982, 1983 and 1984, he denied having any back disorder or other physical impairment.

The second incident occurred in the summer of 1989, when he was injured on a ride at a water slide park. An examination showed he had incurred a compression fracture of the body of the first lumbar vertebra and a slipped disc between the fourth and fifth lumbar vertebrae on the right side.

Wife testified as follows: When husband lifted their daughter from the coffee table in 1980 or 1981, he had significant pain "a good part of the week" and, after that, intermittent pain that "never went away." One day he told her of hearing about a physician in his 50's who hated his practice and wanted to quit. The physician had a slipped disc that he deliberately neglected, letting it degenerate, with the result he ultimately was able to claim

disability. Someone had suggested to husband that he "do that." He told wife, "I'm going to retire by the time I'm fifty no matter what happens." Wife's testimony was corroborated by a family friend, who testified to hearing repeated expressions by husband of a desire to retire by the age of 50.

After considering arguments on the applicability of *Saslow*, *supra*, 40 Cal.3d 848, the trial court made oral findings to the following effect: the benefits husband receives from the disability coverage as originally purchased in 1977 and increased in 1980 to $4,000 per month are his separate property, because that coverage was intended to replace his earnings. But the remaining benefits of $5,000 per month, derived from the addition of $1,000 per month to the original policy and the acquisition of two more policies for $2,000 per month each, are community property, because husband acquired the additional insurance for a different purpose. As the court explained: "Circumstances had changed. He [husband] knew he had a problem with the back. I don't think there was anything fraudulent about [insurance] applications, because there was no specific proof that he had a herniated disc. . . . But I think in the back of his head he knew he was going to have a problem, and that consequently that whole program was geared toward that." Since the court was speaking in the context of our *Saslow* decision, we infer that, in the court's view, the purpose for which husband acquired the additional insurance was to provide retirement income.

The judgment, dated June 14, 1990, describes the three disability insurance policies and provides that (1) $1,000 out of the $5,000 to be paid monthly under the first policy is community property; (2) all of the $4,000 per month to be paid under the other two policies is community property; and (3) the total monthly community property benefits of $5,000 are to be paid $2,500 to husband and $2,500 to wife. The judgment also requires that husband be reimbursed $7,850 from the community for "payments from his separate property of premium payments on the community portion of the Provident disability policy."[1] Husband appealed, challenging only the provisions of the judgment finding $5,000 per month of his disability benefits to be community property. Wife did not appeal.

The Court of Appeal, one justice dissenting, reversed with directions to find all the disability insurance benefits to be husband's separate property and to adjust spousal and child support accordingly. The majority declined on two grounds to apply the requirement of *Saslow*, *supra*, 40 Cal.3d 848, that postseparation disability benefits be classified as community property

---

[1] All three disability policies were issued by Provident Life and Accident Insurance Company.

insofar as they are intended to replace retirement income. First, husband here not only purchased disability insurance, but also invested community funds in a substantial retirement plan, whereas the husband in *Saslow* did not have a retirement or pension plan and could reasonably be found to have procured disability insurance as a substitute for any such plan (40 Cal.3d at pp. 855, 862). Second, unlike the husband in *Saslow*, who began drawing disability benefits before the parties separated, husband here used his separate property to pay renewal premiums on the insurance after separation, and his disability giving rise to the benefits occurred only thereafter, during a policy term for which the premium had not been paid with community funds.

The dissent in the Court of Appeal, on the other hand, would have allowed the community a reduced amount of the $5,000 per month benefits the trial court found to be community property, calculating the reduction as follows: first, those benefits would be divided between community and separate property shares proportionately to the relative amounts of community and separate funds used to pay the premiums on the underlying insurance before and after separation. Second, the community property share would be further restricted to benefits received by husband before he reaches 59½, the age at which his fully funded pension plan becomes available as a retirement resource. All subsequently received disability benefits would be husband's separate property, on the theory those benefits were intended to provide for retirement only until he begins to receive pension benefits.

## II. INTENT TO PROVIDE RETIREMENT INCOME

 In *Saslow, supra,* 40 Cal.3d 848, we recognized that "[t]he primary purpose of disability benefits is to compensate the disabled spouse for lost earnings—earnings which would normally be separate property" (*id.* at p. 860). The benefits, if acquired with community funds, become community property only "insofar as they are intended to provide retirement income." (*Id.* at p. 861, fn. omitted.)

The Court of Appeal concluded any finding of an intent during the marriage to use the disability benefits as retirement income was precluded by the fact that here, unlike in *Saslow*, husband had invested up to $60,000 a year in his professional corporation's tax-qualified pension plan, a plan that was worth approximately $600,000 at the time of separation and was to become available for distribution when he reached the age of 59½. We disagree. Husband's investment in the pension plan did not preclude the trial court from finding the parties intended to supplement the retirement income produced by the plan with benefits from the disability insurance. The court could reasonably infer income from both sources would be required to

maintain the standard of living the parties were deriving from husband's lucrative solo medical practice, particularly since further contributions to the pension plan would be cut off if he fulfilled his wish to retire at age 50.

Other evidence tends to support the trial court's view, expressed in oral findings, that, prior to the parties' separation, the disability insurance in dispute was acquired and maintained out of community funds for the purpose of providing retirement income. Husband testified he hated medical practice, and wife gave testimony of husband's determination to retire by the time he was 50, no matter what happened, and of his tale of a physician who also hated medical practice and had deliberately let his back deteriorate in order to claim disability benefits. Husband's experience of hurting his back in lifting his small daughter, while it did not produce an injury significant enough to require disclosure on disability insurance applications, may have raised in his mind the possibility of following the other physician's example.

*Saslow*, however, indicates that in apportioning disability insurance benefits between community and separate property, the court should consider the spouses' intent not only "at the time the disability insurance was originally purchased," but also "at the times that decisions were made to continue the insurance in force rather than let it lapse" (40 Cal.3d at p. 861). Spousal intent at the latter time is especially important when a basic change of circumstances, such as the parties' separation, has intervened since the insurance was originally purchased. Here, of course, there is no indication or suggestion that husband had any intent of providing *community* retirement income when, after the parties' separation, he used his separate funds to renew the disability policies for additional terms.

### III. PURCHASE OF INSURANCE WITH COMMUNITY FUNDS

Postseparation disability benefits, even if intended to provide retirement income, may be treated as community property only to the extent they were "purchased during marriage with community funds" (*Saslow, supra,* 40 Cal.3d at p. 854). During the parties' marriage and up to the time of separation, community funds were used to purchase each of the insurance policies underlying husband's disability benefits and to renew each policy for additional three-month terms. After separation, however, husband paid further renewal premiums out of his separate property, thereby keeping the insurance in force until he qualified for disability benefits 32 months later.

Term disability insurance is similar in some, but not in all, respects to term life insurance. "Term life insurance policies typically contain two elements, dollar coverage payable in the event of death and a right to

renewal for future terms without proof of current medical eligibility. [¶] . . . [A]s to dollar coverage, term life insurance upon which premiums were paid from community funds has no value after the term has ended without the insured having become deceased." (*Estate of Logan* (1987) 191 Cal.App.3d 319, 324 [236 Cal.Rptr. 368].) "If the insured remains insurable, the right to renew the policy has no value since the insured could obtain comparable term insurance for a comparable price in the open market." (*Id.* at p. 325; accord, *In re Marriage of Spengler* (1992) 5 Cal.App.4th 288 [6 Cal.Rptr.2d 764]; see *In re Marriage of Lorenz* (1983) 146 Cal.App.3d 464 [194 Cal.Rptr. 237] [term life policy insuring a still living spouse not a community asset because it lacks present cash surrender value].)

An insured who is not medically "insurable," however, may be unable after separation to continue life insurance coverage except by exercising the policy's renewal right, previously purchased with community funds, and paying renewal premiums for one or more additional terms out of his or her separate property. If the insured then dies during an additional term thus purchased, it has been held that the community has an interest in the life insurance proceeds commensurate with its contributions to the right of renewal. (See *Bowman* v. *Bowman* (1985) 171 Cal.App.3d 148, 159 [217 Cal.Rptr. 174]; *In re Marriage of Gonzalez* (1985) 168 Cal.App.3d 1021 [214 Cal.Rptr. 634, 54 A.L.R.4th 1195]; *Biltoft* v. *Wootten, supra*, 96 Cal.App.3d 58.)

That the community's purchase of renewal rights in term *disability* insurance gives rise to an analogous community property interest in disability benefits does not, however, follow. Term life insurance and term disability insurance have dissimilar purposes. The proceeds of a term life policy are payable not to the insured, but to survivors, offsetting the economic consequences of the insured's death. To provide for a former spouse's participation in those proceeds, when premium payments from community funds have purchased policy renewal rights necessary to keep the insurance in force, may well be appropriate.

The purpose of term disability insurance, by contrast, is to replace lost earnings. If during the marriage an insured spouse becomes disabled, the benefits received are community property because they replace community earnings. (*In re Marriage of Jones* (1975) 13 Cal.3d 457, 462 [119 Cal.Rptr. 108, 531 P.2d 420].) If the benefits continue after the spouses have separated, they are the separate property of the insured spouse whose earnings they replace, unless during the marriage the premiums were paid out of community funds with the intent that the benefits provide retirement income. (*Saslow, supra*, 40 Cal.3d at pp. 860-861.) If, however, the insured spouse has not become disabled during the last policy term for which a premium

was paid before the parties' separation, the community will have no interest in benefits produced by renewals of the policy for subsequent terms, because the renewal premium will not have been paid "during the marriage with community funds" and with the intent of providing community retirement income (*id.* at pp. 854, 861).

A contractual renewal right that is included in a term disability policy purchased and renewed during the marriage with community funds may afford an insured spouse, who is medically ineligible for new insurance when the parties separate, an opportunity to obtain further disability coverage that would otherwise be unavailable. But unlike a right to renew term life insurance, which keeps alive a possibility of benefits in which the community will have an interest, the right to renew the insured spouse's term disability insurance after separation does not give rise to any community property interest in the insured's disability benefits. (See *Saslow, supra,* 40 Cal.3d at p. 861, fn. 5.)[2]

## IV. CONCLUSION

■■■ None of husband's disability insurance benefits became payable during terms of policy coverage for which the premiums had been paid out of community funds during the marriage with the intent of providing community retirement income. Instead, husband became entitled to draw the benefits only after he had renewed all three term policies, following the parties' separation, with premiums paid out of his separate property and with no such intent. Accordingly, all the benefits are his separate property.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Arabian, J., and Baxter, J., concurred.

---

[2]Justice George's concurring and dissenting opinion, though agreeing that all the disability benefits are husband's separate property, proposes that the trial court be directed, on remand, to require husband to reimburse the community for the value of his contractual rights to renew the policies. Yet no such reimbursement was requested or even suggested below by either party. Valuation of the supposed rights, moreover, would be enormously difficult. For example, since "the insured spouse [who] chooses to let the policy lapse upon separation . . . would not have any obligation to reimburse the community" (conc. & dis. opn. of George, J., *post,* at p. 1042), should valuation be predicated upon renewal for only a single term, or, if not, how should the number of future renewals be predicted? Generally, questions of compensating the community for items that have no conceivable value to anyone except the spouse (unlike custom clothes, golf clubs or stock options, which do have such value) can be addressed more effectively by the Legislature than by the courts. (Compare, e.g., *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 460-461 [152 Cal.Rptr. 668] [professional education held not a community asset] with *In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 766-768 [209 Cal.Rptr. 354, 691 P.2d 1020] [discussing former Civ. Code, § 4800.3 (now Fam. Code, § 2641) on reimbursement of community for contributions to spouse's education or training].)

**BAXTER, J., Concurring.**—I have signed the majority opinion because I concur in the majority's judgment that the disability insurance proceeds are the husband's separate property. I also agree with the majority's reasoning that the present case is distinguishable from *In re Marriage of Saslow* (1985) 40 Cal.3d 848 [221 Cal.Rptr. 546, 710 P.2d 346] (*Saslow*) because the husband in the present case renewed the insurance policies after the parties' marital separation, with premiums paid with his separate property, i.e., his postseparation income, and with no intent to provide retirement income to the marital community. I write separately, however, because I believe that instead of merely distinguishing *Saslow* we should overrule it. *Saslow* was poorly reasoned and incorrect in result and may continue to cause future problems that, unlike this case, cannot be distinguished.

As the majority correctly explains, *Saslow* held that disability insurance proceeds received after marital separation are community property if three conditions are met: (1) the insurance was purchased wholly with community funds; (2) payment of the benefits began before the separation; and (3) the benefits were intended to provide community retirement income. My principal objection to *Saslow* is the third element. In the private disability insurance context, I see no apparent logic in the notion that disability benefits can be a replacement for retirement income.

*Saslow*, *supra*, 40 Cal.3d 848, must first be put in context. It was preceded by a number of decisions dealing with government pensions and disability payments. For example, in the case on which *Saslow* relied most heavily, the husband was entitled to choose between military disability and retirement pay. (*In re Marriage of Stenquist* (1978) 21 Cal.3d 779 [148 Cal.Rptr. 9, 582 P.2d 96] (*Stenquist*).) He chose the disability alternative because its payments were higher—75 percent of his salary rather than 65 percent if he chose the retirement alternative. (Like his retirement, the disability payments were based on length of service and rank.) No one disputed that his retirement pension was a community asset. He contended, however, that the disability payments were his separate property. The court disagreed, finding that he should not be allowed to defeat the community interest in the retirement pension by electing the disability alternative. Specifically, the holding was that military retirement pay for disability contains two components, compensation for lost earnings (separate property) and retirement support (community property).

In *Saslow*, *supra*, 40 Cal.3d 848, as in the present case, the husband was not a government worker. The disability payments were purchased from a private insurer. *Saslow* acknowledged this difference and acknowledged the difficulty of applying the *Stenquist*, *supra*, 21 Cal.3d 779, reasoning, but

nevertheless held that private disability benefits are separate property if they are intended by the parties to replace postdissolution earnings that would have been the spouse's separate property, but are community property to the extent they are intended to replace retirement income. *Saslow, supra,* 40 Cal.3d 848, misinterpreted *Stenquist, supra,* 21 Cal.3d 779. As a later Court of Appeal observed, "The case [*Stenquist*] holds only that the portion of a disability pension which is attributable to employment longevity rather than to the disability is akin to a retirement pension and thus is community property." (*In re Marriage of Fisk* (1992) 2 Cal.App.4th 1698, 1705 [4 Cal.Rptr.2d 95].) In *Saslow, supra,* 40 Cal.3d 848, as in the present case, no portion of the disability benefits were attributable to longevity of employment and thus bore no attribute of a retirement pension. *Saslow* extended *Stenquist, supra,* 21 Cal.3d 779, beyond its logical limits.

Aside from a lack of precedent, the threshold problem with *Saslow, supra,* 40 Cal.3d 848, is that it does not comport with commercial insurance reality. A disability insurer does not pay its insured to retire; rather, the whole purpose of coverage is to replace lost earnings. Imagine the response if a person called his or her insurer and said, "I'm tired of working, sell me a lot of disability coverage, so I can claim a disability and retire early." Preposterous as that is, it is the cornerstone of *Saslow.* One simply cannot, however, purchase disability insurance to retire.

The point in *Stenquist, supra,* 21 Cal.3d 779, and the other government-worker cases was that the bureaucrat had a fund from which to draw based on his years of service, salary, and the like. He could take it either as a retirement pension or as disability. The courts believed the worker should not be allowed to defeat a spouse's interest in this fund that had been acquired with community labor during the marriage merely by labeling the payments as being for disability rather than for retirement. In that limited context, the reasoning perhaps makes some sense. But, in the private disability insurance context, the principle is not only difficult to apply, as acknowledged in *Saslow, supra,* 40 Cal.3d 848, the principle also simply makes no sense. If the person is able to work, he will not be paid the benefits, i.e., as a practical matter insurance companies are not charitable institutions. They are not going to pay an insured to take an early retirement under the ruse of a disability.

Implicit in *Saslow, supra,* 40 Cal.3d 848, was the view that the insurance company had been "scammed." Perhaps the facts in a given case may suggest a spouse has manipulated his or her circumstances so as to quit work early in life. But we should not be second-guessing the carrier's determination that its insured is disabled. If it believed he or she was not disabled, it

surely would not have honored the claim for benefits. To suggest that disability insurance is a form of retirement planning will greatly surprise the insurance industry.

Moreover, the *Saslow* holding, *supra*, 40 Cal.3d 848, seems to require a court to second-guess every insurer's determination to pay benefits. If the insurer refuses to pay, the question of characterization of payments never arises. Thus, the question can arise only when the insurer concludes the insured is legitimately disabled. To characterize the payments as community property, however, the court will have to conclude that the carrier was duped and that the payments are really for retirement rather than for disability. This seems a curious result.

In light of all the flaws in *Saslow*, *supra*, 40 Cal.3d 848, and the problems it causes, I would overrule that decision. Otherwise, I concur in the present majority opinion.

Arabian, J., concurred.

**GEORGE, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that, under the circumstances of this case, the husband is entitled to retain as his separate property *all of the disability benefits* payable under the disability policies, because he chose to maintain the disability policies in force after separation—by paying the renewal premiums from his separate property—and thereafter became disabled. I agree with the majority that the decision in *In re Marriage of Saslow* (1985) 40 Cal.3d 848 [221 Cal.Rptr. 546, 710 P.2d 346]—which held that, under some circumstances, disability insurance benefits, payable to a spouse after separation, may constitute community property—should not be extended to this factual setting.

Although I agree with the majority that the *benefits* payable under the disability insurance policies properly should be considered the husband's separate property, I respectfully dissent from that opinion insofar as it fails to require the husband *to reimburse the community for the value, at the time of separation, of the contractual right to renew the disability policies*, a valuable asset that had been obtained and retained during the marriage through the expenditure of a significant amount of community funds. As I shall explain, in permitting the husband, upon separation, to appropriate for his own use and benefit this valuable *community* asset, without requiring him to reimburse the community for the value of that asset, the majority has departed from established community property principles and has provided an unwarranted windfall to the husband. In my view, regardless of the purpose or intent underlying the decision to obtain the disability policies,

there is no justification for refusing to provide a fair reimbursement to the community under these circumstances.

## I

In analyzing the question whether the community is entitled to any reimbursement with regard to the disability policies at issue in this case, I begin with several familiar principles fundamental to the concept of community property. First, it is well established that property obtained during the marriage with community funds is itself community property. (Former Civ. Code, § 5110, now Fam. Code, § 760.) Second, it also is well established that this principle applies to insurance policies obtained during the marriage with community funds. (See, e.g., *Tyre v. Aetna Life Ins. Co.* (1960) 54 Cal.2d 399, 402 [6 Cal.Rptr. 13, 353 P.2d 725].) Third, it is equally well established that, upon separation of the parties or dissolution of a marriage, one spouse is not entitled to appropriate a community asset for his or her own use without reimbursing the community for the value of the appropriated asset. (Former Civ. Code, § 4800, subd. (a), now Fam. Code, § 2550; see, e.g., *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 372-374 [217 Cal.Rptr. 301].)

As the majority acknowledges, each of the disability insurance policies here at issue was obtained initially during the marriage, and, prior to the parties' separation, all of the premiums were paid with community funds. Accordingly, under the general community property principles set forth in the preceding paragraph, it is clear that, *at the time of separation,* each disability policy was itself *a community asset.*

After the parties separated, the husband appropriated and retained, for his own benefit and use, one significant element of these community assets—the contractual right of renewal contained in each of the then existing disability policies[1]—and thereafter continued to renew the policies until he became disabled and qualified for disability benefits under the policies. In my view, it clearly follows, under the general principles set forth above, that the

---

[1] As prior decisions have explained, renewable term insurance policies contain two basic elements: (1) "dollar coverage," payable if the insured-against event occurs within the policy period, and (2) the right to renew the policy for future terms, typically without proof of continued insurability at the time of renewal. (See, e.g., *Estate of Logan* (1987) 191 Cal.App.3d 319, 324 [236 Cal.Rptr. 368].) In the present case, which involves "privately owned" individual insurance policies (rather than an employment-related group policy), the right of renewal contained in each of the insurance policies clearly constituted a legally enforceable contractual right, and not a "mere expectancy." (See generally, Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1994) ¶¶ 8:88 to 8:94, pp. 8-20 to 8-22; cf. *In re Marriage of Spengler* (1992) 5 Cal.App.4th 288, 299 [6 Cal.Rptr.2d 764] ["the renewal right aspect of an employment-related group term life insurance policy is not property subject to division in marital dissolution *where the employee has no enforceable right to renew*" (italics added)].)

husband should be required to reimburse the community for the value possessed at the time of separation by the appropriated community asset— i.e., the value of the contractual right to renew the disability policies.

## II

A question may be raised whether the contractual right of renewal contained within the disability policies here at issue is a sufficiently significant asset for which reimbursement should be required. In addressing that question, I believe it is useful to describe these disability policies in more detail than is set forth by the majority.

As the majority note each of the disability policies was written with a three-month renewal term and provided that in the event the renewal premium were not paid within the thirty-one-day grace period following expiration of any three-month term, the policy would lapse. At the same time, each policy contained a clause providing that the policy was "non-cancellable" and guaranteeing that the policyholder could continue the policy in force by timely payment of the renewal premiums. Finally—and this point may not be apparent from the majority opinion—each policy guaranteed that, from the time the policy was issued until the insured turned 65 years of age, *the renewal premiums for the policy would remain unchanged*, thus guaranteeing the policyholder that the full disability coverage provided under the policies could be retained until the insured reached age 65 *at the same premium that was in effect when the policy was issued, regardless of the medical condition of the insured.*[2] (The policies also guaranteed the insured the right to renew the policies from age 65 to age 75 so long as the insured was "actively and gainfully employed full time," but with respect to that time period the policies specifically provided that the premium rate was not guaranteed and that the insured would be required to pay premiums based upon "our premium rates in effect at time of renewals.")

Under these circumstances, it appears clear that the contractual right of renewal contained in these policies constituted a significant asset that, in all likelihood, had a substantial value at the time the parties separated. It is evident, of course, that the right of renewal would have significant value if the husband's medical condition at the time of separation was such that, in the open market, he either would have been unable to obtain comparable

---

[2] In this respect, the renewable *disability* policies here at issue differ significantly from the renewable term *life* insurance policies described in *Estate of Logan, supra,* 191 Cal.App.3d 319. In *Estate of Logan,* the court quoted a treatise that stated that, in general, term life insurance policies " 'either have increasing premiums from year to year, or provide decreasing death benefits paid on the insured's death.' " (*Id.* at p. 324, citing 5A Markey, Cal. Family Law, Practice and Procedure (1979) § 122.03[2][b].)

disability insurance at any cost, or, more likely, would have been able to obtain comparable disability insurance only at a significantly increased premium. (Accord, *Estate of Logan, supra,* 191 Cal.App.3d 319, 321, 326.) But even if the husband's medical condition at the time of separation itself would not have affected the availability or cost of comparable disability insurance, the right of renewal contained in the policies in question nonetheless likely possessed a substantial value, because it appears improbable that, at the time of separation, the husband would have been able to obtain comparable disability insurance in the open market *at the same premium that was in effect several years earlier when the disability policy initially was issued and when the husband was younger.* Accordingly, in view of its "guaranteed premium" feature, the contractual right of renewal was likely to have significant value in most, if not all, circumstances. And precisely because the "guaranteed premium" aspect of the policies' right of renewal was so valuable, it appears likely that a substantial portion of the very significant disability premium payments made by the community during the marriage was attributable to this feature of the disability policies.[3]

Under these circumstances, no justification exists for permitting the husband to appropriate, for his own benefit, this contractual right of renewal (which had been obtained during the marriage with community funds), without reimbursing the community for the value of this asset at the time of separation.

### III

The general reimbursement principles set forth above are not inapplicable simply because, after separation, the asset in question—i.e., the right to renew the disability policies—may have been of value only to the husband and not to the wife. There are many items purchased with community funds during a marriage that may be of use or value to only one of the marital partners—for example, a spouse's personal wardrobe, custom golf clubs, or other personalized property. When such items have been purchased during the marriage with community funds they are community property, and if one spouse retains such property upon dissolution, the other spouse is entitled to obtain community property of equal value (or the spouse who retains the property must otherwise reimburse the community for the value of the retained property).

In the case of an individual disability insurance policy, of course, the spouse who is covered by the policy is not compelled to renew the policy

---

[3]According to the testimony of an insurance agent called by the husband, at the time of separation the premiums on the disability policies here at issue exceeded $7,000 per year.

after separation through the payment of premiums from his or her separate income, and thus, if the insured spouse chooses to let the policy lapse upon separation, the insured spouse, not having used a community asset, would not have any obligation to reimburse the community. But when, as here, the insured spouse, upon separation, chooses to exercise the right to renew the policy and maintain it in effect, the insured spouse has retained and utilized, for his or her own benefit, a community asset. Under such circumstances, there appears to be no reason why the spouse who retains such a community asset should not be obligated to reimburse the community for the value of the asset.

## IV

Furthermore, the general community property principles requiring reimbursement under such circumstances are not inapplicable simply because the community asset in question—the contractual right to renew the disability policy—is less tangible than a suit of clothes, a dress, or a set of custom-made golf clubs. If, during the marriage, community funds or efforts are used, for example, to acquire an option to purchase a parcel of real property or shares of stock for an established price at some point in the future, there would be no question, of course, but that the option, though an intangible asset that might never be exercised, would be a community asset that could not be appropriated unilaterally by one of the spouses without reimbursement to the community. (See, e.g., *In re Marriage of Nelson* (1986) 177 Cal.App.3d 150, 154 [222 Cal.Rptr. 790] [stock options]; *In re Marrige of Hug* (1984) 154 Cal.App.3d 780, 782 [201 Cal.Rptr. 676, 46 A.L.R.4th 623] [same].) In like manner, the intangible nature of the contractual right to renew the disability policy, and the possibility that the insured might never become disabled and thus might never receive disability benefits under the policy, provide no justification for permitting the husband to appropriate the right of renewal as his own separate property without reimbursing the community for the value of that significant asset at the time of separation.

## V

Finally, in my view, the established community property principles mandating reimbursement cannot be held inapplicable on the theory that the asset here in question—the right to renew the disability policies at the guaranteed premium—is not reasonably susceptible of valuation. The record in this case contains no evidence whatsoever suggesting that this type of asset is not subject to reasonable valuation, and past cases that have discussed the valuation question with regard to the similar right to renew a term life insurance *policy have observed that "expert testimony can undoubtedly establish its value." (Estate of Logan, supra,* 191 Cal.App.3d 319, 326, fn. 8.)

Indeed, in the course of dissolution proceedings, trial courts frequently are required to determine the value of numerous items, such as pension benefits, stock options, and business goodwill, that may not have a readily ascertainable market value and whose worth must be evaluated on the basis of expert testimony that takes into account a number of variables. (See, e.g., *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 752-754 [214 Cal.Rptr. 661] [pension benefits]; *In re Marriage of Hug, supra,* 154 Cal.App.3d 780, 794 [stock options]; *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 109-110 [113 Cal.Rptr. 58] [goodwill].) There is no reason to believe that experts in the field of insurance are incapable of providing a reasonable estimate of the value of the contractual renewal provisions at issue in this case, based, for example, upon a comparison of the premiums payable under the existing policies with the premiums that the husband would have been required to pay had he sought to obtain, in the open market, a new disability policy, with equivalent benefits, at the time of separation. (See, e.g., *In re Marriage of Gonzalez* (1988) 168 Cal.App.3d 1021, 1026 [214 Cal.Rptr. 634] [suggesting that the "replacement value" of an insurance policy may provide an appropriate method of valuation].) The value possessed by the right to renew the policies *at the time of separation,* of course, is *not* dependent upon the subsequent course of events that transpired after separation, and, in particular, would not be affected by whether, or when, the insured actually became disabled and began receiving benefits under the policy.

## VI

Accordingly, although I agree with the majority's conclusion that the trial court erred in holding that some of the benefits payable under the disability policies should be treated as community property rather than the husband's separate property (and I concur in the majority's affirmance of the Court of Appeal judgment on this point), I conclude that, in addition, we should direct the Court of Appeal to order the trial court, on remand, to determine the value—as of the time of separation—of the community's contractual right to renew the disability policies, and to order the husband to reimburse the community for that amount.

**KENNARD, J.,** Dissenting.—In a unanimous decision rendered in 1985, this court held that when a married couple buys a disability insurance policy with community funds, and the disabled spouse begins receiving benefits on the policy *during the marriage,* policy benefits paid after the couple has separated are the disabled spouse's separate property if such benefits were intended to replace that spouse's postdissolution earnings, but are community property if the couple purchased the policy with the intent to provide

retirement income. (*In re Marriage of Saslow* (1985) 40 Cal.3d 848 [221 Cal.Rptr. 546, 710 P.2d 346] [hereafter *Saslow*].) In this case, noncancelable term disability insurance[1] was purchased with community funds, but benefit payments did not commence until *after the couple's separation*, during which time the insured spouse had used separate property to pay for renewal of the policy. Concluding that *Saslow* is inapplicable here, the majority holds that the disability benefits are entirely the property of the insured spouse.

I disagree. Although disability insurance is rarely purchased for the purpose of providing retirement income, when a couple *has* bought a disability insurance policy with this goal in mind we should recognize the community's interest in the policy, just as we recognize the community's interest in retirement pensions paid for with community funds. Here, in awarding all of the disability insurance benefits to the insured spouse, the majority disregards the substantial sums the community paid to purchase the policy. Not only is this an inequitable result, it is also an erosion of this court's decision in *Saslow*, *supra*, 40 Cal.3d 848. Unlike the majority, I would apply the *Saslow* rule to this case and hold that to the extent the marital couple intended the disability policy to provide for retirement income, the policy proceeds are community property, in an amount proportional to the percentage of the policy premiums paid for with community funds.

I

John and Edie Elfmont (husband and wife) were married in 1975. In 1977, they bought disability insurance that would pay benefits of $3,500 per month if husband, a physician, became disabled.[2] In either 1980 or 1981, husband injured his back, but did not believe the injury was serious. Between 1980 and 1984, the couple gradually increased the coverage under husband's disability policy and purchased additional policies; the couple ultimately carried insurance that would pay $9,000 per month if husband became disabled.[3] The policies were term insurance, renewable every three months. Each policy stated, in capital letters: "NON-CANCELLABLE AND GUARANTEED CONTINUABLE TO AGE 65 AT GUARANTEED PREMIUMS." The policies

---

[1]Term insurance provides coverage for a certain period, or term. The insurance expires at the end of the term if the insured does not renew the policy by paying another premium. So-called "noncancelable" term disability insurance may not be canceled by the insurer so long as the insured continues to pay premiums on the policy. (See Ins. Code, § 10273 [defining noncancelable insurance]; 2 Cal. Insurance Law & Practice (1995) §§ 25.04[2], 26.05[13] [discussing renewability of disability insurance].)

[2]The majority states that husband alone purchased the insurance. Although he may have filled out the application for the insurance, the policy premiums were paid for with community funds. It is therefore more accurate to state that the community purchased the policy.

[3]It is unclear from the record how many separate disability insurance policies the couple ultimately carried. Husband's insurance broker testified that the couple had three policies, one

explained that so long as the insured maintained full-time employment, he or she was entitled to continue to renew the policy, without increase in premium, until the age of 65. They provided for lifetime benefits if the insured became disabled by the age of 60.

In 1985 or 1986, a CAT scan showed that husband had a large herniated disc, apparently the result of the injury occurring in 1980 or 1981. The couple separated in 1987; thereafter, husband, using his separate funds, continued to renew each of the disability insurance policies. In 1989, husband suffered a further injury to his back. The next year, at the age of 50, he retired, and began to receive disability benefits totaling $9,000 per month on the three policies.

In the dissolution proceedings, wife offered evidence that husband had suffered intermittent back pain following his back injury in 1980 or 1981; that he hated the practice of medicine; that he had repeatedly told her and others he intended to retire, "come hell or high water," when he reached 50; and that he had told her about another physician who had deliberately permitted a slipped disc to degenerate so he could claim disability benefits.

The trial court found that during their marriage the Elfmonts had bought 80 percent of their first disability insurance policy (providing $4,000 a month in benefits) as a replacement for husband's income if he became disabled, and that these benefits were thus his separate property. With regard to the remaining 20 percent of that policy (providing benefits of $1,000 per month) and the couple's other two disability insurance policies (each providing benefits of $2,000 per month)—all bought after husband had injured his back in 1980 or 1981—the court found that the parties purchased the disability insurance to provide retirement income, rather than to replace earnings, and that therefore the benefits were community property. Consequently, the court awarded the wife half of these benefits, amounting to $2,500 per month. The court ordered the community to reimburse husband for the separate funds he expended to renew the "community portion" of the policies. The Court of Appeal reversed the judgment, holding that all of the disability benefits were husband's separate property.

II

In *In re Marriage of Stenquist* (1978) 21 Cal.3d 779 [148 Cal.Rptr. 9, 582 P.2d 96] (hereafter *Stenquist*), we addressed the issue of whether the military

providing benefits of $5,000 per month and each of the other two providing benefits of $2,000 per month. Only two policies, however, were admitted into evidence, one providing benefits of $7,000 per month and the other providing benefits of $2,000 per month. The trial court and the parties proceeded under the assumption that there were three policies, as described by the broker; I shall do the same.

disability pension of a husband should be treated as community or as separate property. The husband married six years after joining the Army. Three years after the marriage, he suffered an injury that resulted in amputation of his left arm, but he chose to stay in the service and did not retire until seventeen years later. At that time, he elected to receive a disability pension at 75 percent of his basic pay, in lieu of a retirement pension at 65 percent of basic pay.

In a subsequent court proceeding for dissolution of the marriage, the husband contended that the disability pension was his separate property. In support, he cited this court's decisions in *In re Marriage of Jones* (1975) 13 Cal.3d 457 [119 Cal.Rptr. 108, 531 P.2d 420] and *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561]. *Jones* held that a military person's right to disability benefits, acquired before earning a "vested" right to ordinary retirement benefits, was separate property. The next year, in *Brown*, we held that retirement benefits earned during the marriage, irrespective of whether they were "vested" or "nonvested" at the time of separation, were valuable community assets deserving of judicial protection.

We concluded in *Stenquist* that neither *Jones* nor *Brown* lent support to the husband's claim in *Stenquist* that the disability pension was his separate property. We said: "Looking beneath the label of a 'disability' pension, . . . the trial court found that only the excess of the 'disability' pension rights over the alternative 'retirement' pension represented additional compensation attributable to husband's disability; the balance of the pension rights acquired during the marriage, it ruled, served to replace ordinary 'retirement' pay and thus must be classed as a community asset. [¶] We agree with the reasoning of the trial court; to permit the husband, by unilateral election of a 'disability' pension, to 'transmute community property into his own separate property' (*In re Marriage of Fithian* [(1974)] 10 Cal.3d 592, 602 [111 Cal.Rptr. 369, 517 P.2d 449]), is to negate the protective philosophy of the community property law as set out in previous decisions of this court. We therefore affirm the judgment of the trial court apportioning husband's pension rights between separate and community assets and dividing the community interest equally between the spouses." (*Stenquist, supra,* 21 Cal.3d at pp. 782-783, fn. omitted.)

As we later explained in *Saslow, supra,* 40 Cal.3d at pages 858-859, our decision in *Stenquist, supra,* 21 Cal.3d 779, articulated two rationales in affirming the trial court's disposition: "First, [*Stenquist*] held that it could not 'permit the serviceman's election of a "disability" pension to defeat the community interest in his right to a pension based on longevity.' (*Stenquist,*

*supra,* 21 Cal.3d at p. 786.) Such a result would 'violate the settled principle that one spouse cannot, by invoking a condition wholly within his control, defeat the community interest of the other spouse.' (*Ibid.*) It would unjustly deprive the wife of a valuable property right ' "simply because a misleading label has been affixed to [the] husband's pension fund benefits." ' (*Id.*, at pp. 786-787.) [¶] Second, the *Stenquist* court discussed the purposes of a military disability pension. Such pensions were said to function in part to compensate the veteran for lost earnings and personal suffering caused by the disability. To that extent they were held to constitute separate property. (*Stenquist, supra,* 21 Cal.3d at pp. 787-788.) [¶] However, the court recognized that a 'disability' pension received later in life might function principally as a retirement pension. (*Ibid.*) Indeed, the court found that the 'primary objective' of the disability pension in *Stenquist* was to provide retirement support. Therefore, it held that the portion of the disability pension that was equivalent to the regular retirement pension was community property. (*Id.*, at pp. 788-789.)"

Applying to the facts of *Saslow* the rationale of *Stenquist, supra,* 21 Cal.3d 779, we concluded that when disability insurance is purchased to replace a disabled spouse's lost earnings, any postseparation disability benefits are the disabled spouse's separate property. (*Saslow, supra,* 40 Cal.3d at pp. 860-861.) Benefits under the disability insurance policy, if acquired with community funds, become community property only if the benefits were intended to provide the marital couple with retirement income. (*Ibid.*) Pointing out that under California law a retirement pension is community property to the extent that it was paid for with community funds, *Saslow* held that disability benefits intended to take the place of retirement benefits should be treated the same way.[4] To do otherwise, we observed, would deprive the nondisabled spouse of a valuable property right simply because the benefits received were given the "misleading label" of disability rather than retirement benefits. (*Saslow, supra,* 40 Cal.3d at p. 860.)

We acknowledged in *Saslow* that the "purpose" analysis articulated in *Stenquist, supra,* 21 Cal.3d 779, would in some cases be difficult to apply,

---

[4]A married couple may purchase disability insurance for the purpose of providing retirement benefits when, as in this case, the insured spouse suffers from a degenerative condition which, the couple believes, is likely to ultimately cause the insured spouse to retire. Although the concurring opinion by Justice Baxter asserts that it is "preposterous" to expect that an insurance company will provide insurance to a person with such a condition (conc. opn., *ante,* p. 1037]), an insurance company may be contractually obligated to do so under an agreement to offer disability insurance to all employees of a company for which an insured is employed. Alternatively, an insurance company may believe that the insured's condition will not cause his or her retirement until the amount of the premiums exceeds the present value of the amount it will ultimately pay out in benefits. In any event, in this case the insurer *did* insure husband, and substantial evidence supports the trial court's decision that husband and wife bought the insurance to provide them with retirement benefits.

citing the factual scenario in *Saslow* itself as a prime example. But, expressing faith in the ability of experienced trial judges to make difficult factual determinations, we concluded in *Saslow* that *Stenquist*'s "purpose" or "primary objective" analysis would lead to "the most equitable distribution of disability insurance benefits." (*Saslow, supra,* 40 Cal.3d at pp. 860-861.)

The facts of this case are almost identical to those of *Saslow, supra,* 40 Cal.3d 848. The only difference is that in *Saslow* the disabled husband retired and began receiving benefits under the disability policy before he and his wife separated, while here the disabled husband started drawing disability benefits three years after he and his wife had separated. The majority regards this difference as significant. I do not.

As I have pointed out previously, the marital community retains a post-separation interest in a spouse's retirement pension that has not vested at the time of separation. (*In re Marriage of Brown, supra,* 15 Cal.3d 838.) In my view, there is a similar community interest in a noncancelable term disability insurance policy which was purchased by the marital community for the primary purpose of providing retirement income, from which no benefits are being drawn at the time of separation. In either case, the marital community looks to the pension or the insurance as a source for retirement funds. In each situation, the community's interest is contingent: at the time of dissolution there is no assurance that any insurance or pension benefits will ever be paid to either spouse. In each case, accrual of benefits depends on the actions of one spouse: unless the spouse carrying the disability insurance continues to pay the premiums on the policy, no benefits on the policy will be paid, and unless the spouse eligible for the pension continues employment at the job until the pension vests, no pension benefits will be paid (*In re Marriage of Foster* (1986) 180 Cal.App.3d 1068, 1072-1074 [227 Cal.Rptr. 446]).

Because, as just explained, disability insurance purchased as a substitute for retirement benefits shares the same purpose and essential characteristics of a pension, it should be treated the same as a pension under our community property system, regardless of when the benefits on the pension or the disability insurance policy are first paid. Thus, the rule this court enunciated in *In re Marriage of Brown, supra,* 15 Cal.3d 838—that postseparation retirement benefits are community property to the extent those benefits are attributable to the community—should apply with equal force to postseparation disability benefits that the parties intended as retirement income, even when no disability benefits are paid until after the spouses have separated. For the reasons set forth above, I conclude that this case is governed by this court's decision in *Saslow, supra,* 40 Cal.3d 848.

The majority seeks to distinguish *Saslow*, *supra*, 40 Cal.3d 848, and holds that the disability payments in this case are husband's separate property. The majority reasons that the community's interest in the noncancelable term disability insurance policies ended upon expiration of the last term for which the premiums were paid with community funds. The majority points out that although husband thereafter continued to renew the policies, he did so with his separate funds, and although he may have done so for the purpose of providing *himself* with retirement income, he no longer desired to provide the *community* with such income. Accordingly, the majority concludes, the community had no interest in any benefits under the policy when the disability causing husband's retirement from his medical practice occurred after the expiration of the last term of disability coverage that was purchased with community funds. (Maj. opn., *ante*, pp. 1034-1035.)

The majority's reasoning is based on a fallacious premise: By holding that the marital community's interest in husband's disability insurance policy expired when the last term paid for with community funds ended, the majority treats noncancelable term disability insurance as if it merely provides the insured party with coverage for a discrete period of time. In so doing, however, the majority ignores a critical aspect of such insurance. Noncancelable term disability insurance not only provides the insured with benefits if a disability arises during the term covered by the policy; equally important, it also gives the insured the right to continue to renew the policy, *with no increase in premiums*, even if the insured has since inception of the policy developed a medical condition that may render him or her uninsurable. Depending on the insured's condition, the right of renewal can be as valuable, or even more valuable, than the disability coverage for the term covered by the policy, because it provides assurance of coverage, regardless of medical condition.

This case provides a good illustration of the value of the right of renewal. As mentioned earlier, in 1985 or 1986 a CAT scan showed that husband had a large herniated disc in his back. The existence of that condition, if revealed to the insurer, would most likely have made the insurer quite reluctant to cover husband for disability arising from problems with his back; it is a virtual certainty that any company willing to insure him under these circumstances would have charged substantially higher premiums than those paid on the disability insurance policies purchased by the community at a time when husband could truthfully state that he was unaware of having any serious back injury. In all likelihood, it was only the right of renewal, paid for with community funds, that enabled husband to insure himself for the period in which he suffered the additional back injury that led to his retirement, thus enabling him to receive the disability benefits at issue in this case.

Although there is no California decision dealing with the precise issue presented here—whether the marital community retains a postseparation interest in noncancelable term disability insurance originally purchased with community funds—the question of whether the community retains an interest in term *life* insurance that is initially purchased with community funds but is thereafter renewed with separate funds has been addressed in a number of opinions. Most have held that the community retains a postseparation interest in the policy, so long as the right of renewal is valuable. (*Bowman* v. *Bowman* (1985) 171 Cal.App.3d 148, 159-160 [217 Cal.Rptr. 174]; *In re Marriage of Gonzalez* (1985) 168 Cal.App.3d 1021 [214 Cal.Rptr. 634]; *Biltoft* v. *Wootten* (1979) 96 Cal.App.3d 58 [157 Cal.Rptr. 581]; *Modern Woodmen of America* v. *Gray* (1931) 113 Cal.App. 729 [299 P. 754]; but see *In re Marriage of Spengler* (1992) 5 Cal.App.4th 288 [6 Cal.Rptr.2d 764] [renewal right a mere "expectancy"]; *In re Marriage of Lorenz* (1983) 146 Cal.App.3d 464 [194 Cal.Rptr. 237] [term life insurance not a community asset because it lacks cash surrender value].) The same should be true of the disability insurance policy in this case.

According to the majority, term disability insurance and term life insurance have different purposes and therefore should be treated differently. Term life insurance, the majority asserts, is intended to offset the economic consequences of the insured's death, while term disability insurance "is to replace lost earnings." (Maj. opn., *ante*, p. 1034].) This asserted purpose of disability insurance is at odds with this court's statement in *Saslow*, *supra*, 40 Cal.3d 848, that an insured may purchase disability insurance not to replace lost earnings but to provide retirement income. The majority does not explain how its approach can be reconciled with *Saslow*, perhaps because it is unable to do so.

For the reasons set forth above, I conclude that the trial court properly found that $5,000 per month in disability benefits that were intended to provide retirement income should not be treated as husband's separate property. The trial court, however, erred when it concluded that *all* of those benefits were community property. Those benefits are in part attributable to husband's postseparation renewal of the insurance with his separate funds, and the trial court's order that the community pay husband the amount of the premiums paid with his separate property does not adequately compensate husband for his separate interest in the insurance benefits. A retirement pension paid for partly with community and partly with separate funds would be subject to apportionment. (*In re Marriage of Brown*, *supra*, 15 Cal.3d at p. 848; see also *Biltoft* v. *Wootten*, *supra*, 96 Cal.App.3d at p. 62 [apportioning term life insurance].) Similarly, in this case the trial court should have apportioned the benefits based on the contributions of the

community and of husband's separate property from the time the community first purchased the policies. The majority of the premiums were paid with community funds; accordingly, a corresponding percentage of the benefits should be community property.

I would reverse the judgment of the Court of Appeal.