[No. H030284. Sixth Dist. Aug. 28, 2007.]

In re the Marriage of MARY ANN L. and JAMES W. GRAY.
MARY ANN L. CAVERLY, Respondent, v.
JAMES W. GRAY, Appellant.

COUNSEL

Lipton, Warnlof, Segal, et al., and Mark Hanley Lipton for Appellant.

Law Offices of Nancy Bennett Bunn and Nancy Bennett Bunn for Respondent.

OPINION

**DUFFY, J.**—Over the course of his career with the International Brotherhood of Electrical Workers (IBEW), some 15 years of which included his marriage to Mary Ann L. Gray (Caverly), James W. Gray has earned the right to receive a pension upon retirement through a defined benefit plan. James and

Mary Ann[1] were married in 1963 and they separated in 1979. Their interlocutory judgment of dissolution of marriage was filed in 1980. As to James's pension, the judgment stated that the court would reserve jurisdiction over it until benefits would become due and payable, and then, "the *Brown* Formula shall be applied."[2] (Italics added.)

In 2005, Mary Ann applied to receive her share of James's monthly retirement benefit, with payment to begin in April 2006 when James would have 42 years of vesting credit towards his defined pension benefit. In response to the IBEW's calculation of Mary Ann's share of his monthly benefit in accordance with the "time rule,"[3] James filed a motion in the superior court for "Pension Division." The motion asked the court to "determine the community interest" in James's IBEW pension. In support of the

---

[1] For ease of reference and meaning no disrespect we refer to the parties by their first names, as is customary in family law cases. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707].)

[2] This reference was to the California Supreme Court's then fairly recent decision in *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561] (*Brown*). *Brown* held that the rights to pension benefits that derive during marriage (even those which are nonvested and unmatured) are community property subject to division in a marital dissolution. Prior law had generally held that pension rights that were nonvested or unmatured at separation were mere contractual expectancies, not property subject to division. (*Brown, supra*, at pp. 841–842, 844–848; *In re Marriage of Elfmont* (1995) 9 Cal.4th 1026, 1046, 1048 [39 Cal.Rptr.2d 590, 891 P.2d 136] (dis. opn. of Kennard, J.).) The court in *Brown* further held that in exercising its discretion to make a pension division, depending on the circumstances of the particular case, a trial court could divide in kind, retaining jurisdiction to later implement the division, or could cash out the nonemployee spouse's interest by determining its present value and ordering payment to that spouse or offsetting that value with other assets. (*Brown, supra*, at p. 848; *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 749, 756 [214 Cal.Rptr. 661].)

[3] The traditional "time rule" provides that whenever credited time of service is a substantial factor in determining the benefit payable under a defined benefit plan, the extent to which that service was provided during the marriage in comparison to the total duration of service will alone determine the community share. The community share is thus derived per a purely mathematical formula under which time or years of service is the determining factor. (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 176 [74 Cal.Rptr.2d 825, 955 P.2d 451] (*Lehman*); *In re Marriage of Poppe* (1979) 97 Cal.App.3d 1, 8 [158 Cal.Rptr. 500] (*Poppe*); *In re Marriage of Judd* (1977) 68 Cal.App.3d 515, 522–523 [137 Cal.Rptr. 318] (*Judd*); *In re Marriage of Adams* (1976) 64 Cal.App.3d 181, 183 [134 Cal.Rptr. 298].) According to the time rule, the community interest is that fraction of the retirement benefits, the numerator of which represents the length of service during marriage and the denominator of which represents the total length of service by the employee spouse. (*Judd, supra*, 68 Cal.App.3d at p. 522.) The rule thus divides the separate property and community property interests in a pension by giving equal weight to each year of service, regardless of whether the divorce occurred early in the employed spouse's career (when salary-based pension contribution deductions might be smaller but would have longer to grow) or closer to retirement (when salary-based pension contribution deductions might be greater but would have less time to grow).

motion, James offered his understanding that the previously entered interlocutory judgment reflected his prior stipulation with Mary Ann. His understanding of that stipulation was that the court would retain jurisdiction over the pension, which would be divided when it later became payable per the "*Brown* Formula." To James, this simply meant that "the community . . . interest would be based on the benefits earned during the marriage (plus any enhancement to [the] pension due to community years) then divided equally." According to James, then, the court's 25-year-old interlocutory judgment characterized pension benefits derived during his marriage to Mary Ann, including those which were then nonvested or unmatured, as community property per *Brown* but did not apportion or divide the now fully accrued pension as between community and separate property or select a method of apportionment, which he asked the court to do.

Mary Ann opposed the motion, contending that the interlocutory judgment's reference to application of the "*Brown* Formula" meant that the court had already not only characterized the pension rights as community property but had also already apportioned or divided it as between the community and James's separate property per the "time rule," which, she contended, was and is synonymous with the term "*Brown* Formula." According to Mary Ann, all that remained for the court to do was to implement the division per the time rule as the retirement benefits were paid out.

The trial court agreed with Mary Ann. On James's motion for pension division, therefore, the court did not exercise its discretion in selecting application of the strict "time rule" as an equitable method of division of the pension, instead interpreting the 1980 judgment as having already determined that that apportionment method would apply by its reference to the "*Brown* Formula."

We conclude that even if it is now, in 1980, the term "*Brown* Formula" was not a universally accepted synonym for the "time rule."[4] In the context of the interlocutory judgment in this case in which the record does not reflect either an agreement of the parties to employ the time rule or a judicial exercise of discretion to do so, that term is instead reasonably interpreted as an indication that the court had then determined the community to have an interest in James's pension and had directed that total accrued benefits at retirement would be divided in kind in the future exercise of the court's discretion. We accordingly reverse the trial court's order directing division of the pension per the time rule and remand the matter for the court to exercise its discretion in determining an equitable division of the pension.

---

[4] The parties appear to agree that in today's usage, the term "*Brown* Formula" is commonly understood as a reference to the time rule. We will therefore assume this to be the case.

## STATEMENT OF THE CASE

### I. *Factual Background*

James and Mary Ann were married on August 24, 1963. In 1972, James, through the IBEW, began participating in a newly established defined benefit pension plan. At the plan's inception, James was given a 10-year past service credit (for the years 1961 to 1971) for his prior work in the electrical industry even though no contributions had been received to support that benefit. Each of these 10 years was assigned an annuity value of $10 per month, for a total retirement benefit for these past service years of $100 per month, assuming retirement at age 65.

James and Mary Ann separated on February 1, 1979. For the years 1972 to 1978, James earned one retirement vesting credit per year. But his potential monthly retirement benefit for these years of service was calculated not based on credits but instead on contributions received, as a percentage (3 percent) of those contributions. The contributions in turn were based on the varying hours that James worked as reported in each of those years. Per the annual Pension Trust Fund statements James began receiving in 1973, therefore, it was easy to calculate his accrued monthly retirement benefit as of the date of separation in early 1979 based on prior service credits for the years 1961 to 1971, plus 3 percent of contributions paid thereafter through separation, at $270.24, all of which James acknowledges is community property.

In her community property declaration filed in their dissolution action before entry of the interlocutory judgment, Mary Ann proposed that the court reserve jurisdiction over James's pension "until benefits are due and payable." She did not propose in that document a method of apportioning the pension.

Appearing before the court in their dissolution case on November 7, 1980, the parties stipulated to "distribution of [IBEW] retirement fund reserved." Later that same month, their interlocutory judgment of dissolution of marriage was entered. Despite the earlier stipulation, the judgment stated that the proceedings had come on for "contested hearing" on November 7, 1980. With respect to James's pension, the judgment provided that the "Court reserves jurisdiction over that certain IBEW Retirement Plan through [James's] employment until such time as benefits are due and payable, and at such time, the *Brown* Formula shall be applied."[5]

---

[5] We note that the words "*Brown* Formula" in the judgment have extra type spaces around them and that they do not appear exactly on the same line as the surrounding text, suggesting that these words were later added to the original document where a space had intentionally

In 1981, James remarried. That marriage also ended in divorce, with a separation date of August 15, 1998. From 1981 through 1996, James continued to accrue annual credited contributions toward retirement, with his monthly benefit calculated as a percentage of those contributions, based on the number of hours worked in each year.[6] Beginning in 1997, James began working in a management capacity with the result that while he continued to accumulate annual vesting credit, he no longer received credited contributions or annual increases to his monthly retirement benefit calculated as a percentage of those contributions.

As part of the dissolution of his second marriage and with respect to his defined benefit pension, James and his second wife stipulated to a qualified domestic relations order (QDRO) under the federal Employee Retirement Income Security Act of 1974 (ERISA), codified at title 29 United States Code section 1001 et seq.[7] The QDRO attributed community benefits in relation to the entirety of James's retirement benefit according to a year-by-year analysis of hourly contributions made and retirement benefits to be received rather than strictly per the time rule based on longevity or years of service.

In 2005, when James was eligible to receive retirement benefits,[8] Mary Ann submitted an application to the IBEW, which had previously been provided with a copy of her and James's interlocutory judgment of dissolution, to receive her share of his defined benefit pension beginning April 1, 2006.[9] IBEW then provided her with a benefit calculation, which applied the time rule (there referred to as "*Brown* Formula") to James's 42 years of

---

been left. The form of the judgment appears to have been prepared by Mary Ann's lawyer and it was "[a]pproved as to form and content" by James's lawyer.

[6] As before, with the exception of the first 10 years of past service credit, the accrued benefit for each year was derived from the number of reported hours worked, and this amount was added to the cumulative monthly benefit at retirement.

[7] Under ERISA, spouses in dissolution actions may not transfer rights in retirement benefits unless the court so orders in a QDRO. (29 U.S.C. § 1056(d)(1); *In re Marriage of Rich* (1999) 73 Cal.App.4th 419, 423 [86 Cal.Rptr.2d 452].) A QDRO is a judgment or order that creates a right in a former spouse to receive all or a portion of the benefits payable to the participant in a pension plan. (29 U.S.C. § 1056(d)(3)(B)(i)(I).)

[8] Although eligible to receive benefits at that point because they were fully vested and matured, James continued to work.

[9] James's defined benefit plan is denominated Part A to his pension. Mary Ann also applied for distribution of her share in James's defined contribution plan (Part B), a second component of his total pension benefits. This is not relevant to this appeal except to the extent James argues that Mary Ann accepted IBEW's calculation of her share of the Part B benefit, which was not per the time rule, reflecting, he argues, her true understanding of their prior stipulation as evidenced by the interlocutory judgment.

service (through April 28, 2005) to derive a monthly benefit to Mary Ann of $560.58 based on a total monthly benefit then accrued of $3,139.63.[10]

## II. *Procedural Background*

In response to the IBEW calculation of Mary Ann's share of his monthly benefit per the time rule, James filed a motion for pension division in which he requested the court to "determine the community interest in [his] pension through the IBEW Local 332 Pension Plan." The thrust of the motion was James's contention that the prior judgment's reference to the *"Brown Formula"* was not a previous agreement or determination that the time rule should be applied to divide or apportion the pension when it later accrued and became payable. It was instead an acknowledgement in 1980 that under *Brown,* the community had an interest in his pension rights derived during marriage—even before certain rights had vested or accrued—and a determination that when benefits were to become payable, the community should receive a pro rata credit for that interest. (*Brown, supra,* 15 Cal.3d at pp. 841–842, 844–848.)

James's declaration in support of the motion said that he understood the prior judgment's reference to the *"Brown* Formula" to mean simply that "the community (my share and [Mary Ann's] share) interest would be based on the benefits earned during the marriage (plus any enhancement to my pension due to community years) then divided equally." James also acknowledged his understanding at the time of the judgment that if the plan benefit formula applicable to his pension were to increase in the future, the community share of the benefit would be enhanced by that increase for those years of service attributable to the marriage.

James further offered that if the community interest in his pension were to be apportioned per the time rule, he would receive less than 50 percent of his total pension benefit due to the amounts together attributable to the community property interests of both his failed marriages. James further suggested that an appropriate method by which to apportion the community interest in his pension, and then to derive Mary Ann's share of that interest, would not be by application of the strict time rule but, rather, by a modified time rule since years of service was not a substantial component in the calculation of his monthly benefit, that benefit having largely been derived as a percentage

---

[10] This benefit was derived by applying a numerator of 15 (years of marriage); a denominator of 42 (years of service); and multiplying that resulting figure (0.3571) by the monthly benefit of $3139.63 to ascertain the community benefit of $1,121.16, of which one half ($560.58) was assigned to Mary Ann.

of yearly contributions based on hours worked (after accounting for the initial $100 per month benefit based on the 10 years of past service credit).[11]

In response to the motion, Mary Ann contended that the IBEW calculation of her share of James's monthly retirement benefit under the defined benefit plan per the time rule was in accordance with the prior judgment—the time rule being synonymous with the term "*Brown* Formula" both in 1980 and currently. But with respect to just what that term in the judgment had meant, she offered by way of declaration: "I don't believe I had a clear understanding of the *Brown* Formula at that time other than I had been awarded an equitable share of [James's] pension benefits and that my share would stay in the plan to grow and mature until [James] retired." She further stated her understanding that what James now wanted was to have "the benefit frozen as of the [separation] date." Mary Ann accordingly requested the court to confirm application of the time rule to calculate her share of James's monthly benefit using the "*Brown* Formula" as referenced in the 1980 judgment.

At the hearing on James's motion, the trial court was unequivocal that it considered the judgment to be "clear," meaning that it perceived the term "*Brown* Formula" to be synonymous with application of the time rule. The court, perceiving James to be trying to alter the judgment in "hindsight," ruled that application of the time rule to division of James's retirement benefit was "a done deal" per the prior judgment and the court therefore declined to exercise its discretion to equitably select that method of apportionment or any other, instead merely implementing what it considered to have already been determined.

The court's subsequent written order[12] (filed in July 2006) found that the parties had in 1980 "entered into a stipulated Interlocutory Judgment," which was "clear on its face." The judgment provided for application of the "*Brown* Formula," which the court found to be "synonymous with the 'time rule.' " This rule, the court said, "requires that the community portion of the pension benefit be determined by creating a fraction and multiplying that fraction against the final monthly pension benefit. That fraction has as its denominator

---

[11] The percentage applied to James's earned contributions to derive his monthly benefit was 3 percent through the first 20 years of service subsequent to the initial 10 years of past service credit. For years 21 through 25, that percentage was increased to 3.25 percent, an enhancement to the contributions for years of service during marriage to Mary Ann that James concedes is community property per *Brown* and *Lehman*. This concession means, contrary to Mary Ann's contention, that James was not requesting that Mary Ann's share of the benefit be frozen as of the time of separation because it acknowledges this enhancement, however slight, as community property.

[12] The notice of appeal was filed before entry of the written order, making the notice premature. On our own motion, we deemed the notice of appeal to be from the subsequent written order, which we augmented the record to include.

the total years of pension accrual and as its numerator the number of years of marriage during which the pension accrued. In this matter the years of pension accumulation (the denominator) are 42 and the years of marriage during which the pension accrued are 15 (the numerator). The accumulated pension benefit is $3,139.63 per month. The community interest is 15/42 or .3571[,] which equals $1,121.16 per month. The amount to be allocated to [Mary Ann] as her monthly share of [James's] IBEW Local 332 Pension benefit is [one half] of $1,121.16[,] which is $560.58."

This appeal followed.

## DISCUSSION

### I. *Issue on Appeal and Standard of Review*

■ In dividing the community estate as part of a marital dissolution, the court must generally effect an equal division. (Fam. Code, § 2550.)[13] In particular regard to retirement plans, the "court shall make whatever orders are necessary or appropriate to ensure that each party receives the party's full community property share in any retirement plan . . . ." (§ 2610, subd. (a).) And when the court concludes that property contains both separate and community interests, the court has very broad discretion to fashion an apportionment of interests that is equitable under the circumstances of the case. (*In re Marriage of Gowan* (1997) 54 Cal.App.4th 80, 88 [62 Cal.Rptr.2d 453] (*Gowan*); *In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 782–783 [201 Cal.Rptr. 676] (*Hug*).) The court is not bound by a particular method of allocation. Rather, the court should divide the property " 'by whatever method or formula will "achieve substantial justice between the parties." ' [Citation.]" (*Gowan, supra*, at p. 88.)

Similarly, " ' "In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation . . . ." [Citations.]' " (*Hug, supra*, 154 Cal.App.3d at p. 791.) "Whatever the method that it may use, however, the superior court must arrive at a result that is 'reasonable and fairly representative of the relative contributions of the community and separate estates.' [Citation.]" (*Lehman, supra*, 18 Cal.4th at p. 187.)

But as we see it, in this case, the issue is not whether the court abused its discretion in selecting the time rule as the appropriate method of dividing the community and separate property interests in James's defined benefit pension.

---

[13] Further unspecified statutory references are to the Family Code.

Indeed, the record makes clear that the court did not apply this formula to the pension benefit division based on equitable considerations. Instead, the court understood the prior judgment to have already divided the pension per the time rule, thus constraining the exercise of its discretion to the implementation of this predetermined division accordingly.

The issue on appeal is therefore whether the trial court erred in failing to exercise its discretion to divide the pension benefit equitably because it found that the parties had already stipulated, and the court had already determined, that the pension benefit would be divided per the *"Brown* Formula," a term which it found to be synonymous with the time rule. A trial court's failure to exercise discretion is itself an abuse of discretion, and we review such action in accordance with that standard of review. (*People v. Orabuena* (2004) 116 Cal.App.4th 84, 99 [10 Cal.Rptr.3d 99]; *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 449 [99 Cal.Rptr.2d 678].)

## II. *Analysis*

Here, because the trial court perceived that its discretion to divide the pension was constrained by the 1980 interlocutory judgment, the question comes down to the proper construction of that judgment, which reserved jurisdiction over James's pension benefits for later division per the *"Brown* Formula." In other words, did that reference—by its clarity and universally understood meaning—require the trial court on James's motion for pension division to apportion the pension benefits per the time rule instead of exercising its discretion to select an equitable method of apportionment, whether the time rule or some other?

In order to resolve this question, we construe the judgment. In the course of doing so, we examine the evolution of the time rule and the context of its application both before and after the 1976 *Brown* decision.[14] This examination leads us to conclude that the prior judgment's use of the term *"Brown* Formula" did not necessarily dictate that the later pension division would be accomplished by application of the time rule.

The signature of the strict time rule is the way in which it makes time alone the determining factor in apportioning community and separate interests in defined benefit pension plans. This has the effect of eliminating from the apportionment equation other factors such as fluctuations in salary that affect the total benefit amount, that amount often being determined by a plan

---

[14] For a thoughtful discussion of the development and use of the time rule in the division of defined benefit pension plans, and a suggested alternative approach, see James Crawford, Jr.'s three-part article, *The QDRO Reader*, in the ACFLS (Association of Certified Family Law Specialists) Newsletter (Spring 2005, No. 2; Winter 2005, No. 3; Fall 2006, No. 5).

formula that takes salary or earning levels into account. The rationale for the rule is that even though an employee spouse while married might have earned less in early career years than in the later prime of a career that might occur postseparation, the right to the ultimate benefit, at least in part, still accrued during the earlier marriage. This entitles the marital community to evenly share in the ultimate benefit based solely on the ratio of the duration of the marriage to the duration of the total employment service, regardless of the amount of the benefit specifically attributable to service or salary during the marital years or any breaks in service. (*Gowan, supra*, 54 Cal.App.4th at pp. 90–91.)

■ Today, although the court has discretion to choose among apportionment methods, the time rule is the most frequently employed method of dividing pension benefits. According to our Supreme Court, its use "is not unreasonable when the 'amount of retirement benefits is substantially related to the number of years of service.' [Citations.]" (*Lehman, supra*, 18 Cal.4th at p. 187; see also *Poppe, supra*, 97 Cal.App.3d at pp. 8–9 [application of strict time rule inappropriate where service points rather than years of service determined the benefit amount].) Nor is the time rule's result "unreasonable when the 'relative contributions of the community and separate estates' are accounted for. [Citation.]" (*Lehman, supra*, at p. 187.) The frequency of the rule's application is largely driven by the fact that the number of years of service factors substantially in determining the amount of the income stream in most defined benefit pension plans.

The idea that varying compensation over a career should not be taken into account in the pension-division process seems to have made its first appearance in a published case in 1972 when the California Supreme Court decided *Waite v. Waite* (1972) 6 Cal.3d 461 [99 Cal.Rptr. 325, 492 P.2d 13] (*Waite*),[15] a case that did not even involve apportionment since the pension there resulted entirely from employment during marriage, i.e., it was entirely community property.

■ In *Waite*, husband, a judge, contended that his pension should be characterized as separate property since, for one thing, the amount of the retirement benefit was indexed to whatever operative judicial pay scale was in effect in the years after he retired. Thus, the judicial pay scale was subject to upward legislative changes, of which husband would continue to enjoy the benefits even after retirement. He argued that these changes to the benefit meant that his pension rights did not accrue at all until after the marriage had

---

[15] On a different point, *Waite*, along with many other cases, was expressly overruled in *Brown* by the court's holding, contrary to its prior decisional law, that even nonvested and unmatured pension rights are community property. (*Brown, supra*, 15 Cal.3d at p. 851, fn. 14.)

ended. The court rejected husband's argument, concluding that postretirement compensation rates are irrelevant to benefit characterization. The court observed that "[t]he plan of payment of the pension—whether fixed, or reflective of subsequent salary increases in the relevant position—does not change the nature of the right to the pension. The right flows from the services rendered by the employee during marriage; the manner of the expression of the right does not distort it or alter its community characteristic." (*Waite, supra,* 6 Cal.3d at p. 471.) The court added, "Whether a pension plan provides for fixed or variable payments, and whether adjustments occur automatically or require legislation [as in the case of judicial pensions], the basic point remains that the pension payment serves as a remuneration for services rendered by the employee; if these services were discharged during the marriage, that remuneration must compose a community asset." (*Ibid.*)

In at least three characterization (as opposed to apportionment) cases decided after *Waite* but before *Brown,* all of which involved military pensions that had vested during marriage even though the husband in each case had not yet retired at the time of separation, courts concluded that there was a community property interest in the pensions, which were proportionately divisible based on years of service. (See *Bensing v. Bensing* (1972) 25 Cal.App.3d 889, 891–894 [102 Cal.Rptr. 255] (*Bensing*) [husband had completed required number of years of service at time of separation and had only to apply for retirement benefits, which were proportionately divisible as between community and separate property based on years of service]; *In re Marriage of Wilson* (1974) 10 Cal.3d 851, 854–856 [112 Cal.Rptr. 405, 519 P.2d 165] (*Wilson*) [husband had premarital separate property interest in fully vested military pension, which was proportionately divisible based on premarital versus marital years]; *In re Marriage of Martin* (1975) 50 Cal.App.3d 581, 583–585 [123 Cal.Rptr. 634] (*Martin*) [upon dissolution, wife was entitled to her proportionate share of husband's expected retirement benefit based on marital years of service even though husband had not yet retired and was not yet receiving benefits].) While these cases thus concerned characterization of pension benefits accrued during marriage, they also endorsed the idea that apportionment could be accomplished by dividing the community and separate property benefits on a pro rata basis based simply on time of service during the marriage in relation to the total years of service.

In 1976, the California Supreme Court decided *Brown,* reversing prior precedent,[16] which had held that nonvested and unmatured pension rights at dissolution were mere expectancies and not property subject to division. (*Brown, supra,* 15 Cal.3d at pp. 841–842, 844–848, 851 ["Pension rights, whether or not vested, represent a property interest; to the extent that such

---

[16] Among those overruled were *Bensing, supra,* 25 Cal.App.3d 889, and *Martin, supra,* 50 Cal.App.3d 581. (*Brown, supra,* 15 Cal.3d at p. 851.)

rights derive from employment during coverture, they comprise a community asset subject to division in a dissolution proceeding"], overruling *French v. French* (1941) 17 Cal.2d 775 [112 P.2d 235], among other cases.)

■ The court also held in *Brown* that, depending on the circumstances of the particular case, pensions could be divided in one of two ways—division in kind with the trial court retaining jurisdiction to later implement the division as benefits become payable, or cash out by reduction of the community interest to present value and payment to the nonemployee spouse or offsetting of assets as between the spouses to account for the community value. (*Brown, supra*, 15 Cal.3d at pp. 848–849.) The manner in which the court chooses to effect apportionment—by division in kind or by cash out—may be dictated by feasibility issues and the degree to which the court at the time of dissolution is able to evaluate the risk that factors such as death or termination of employment will destroy pension rights before they mature. (*In re Marriage of Skaden* (1977) 19 Cal.3d 679, 689 [139 Cal.Rptr. 615, 566 P.2d 249]; *In re Marriage of Alarcon* (1983) 149 Cal.App.3d 544, 558–559 [196 Cal.Rptr. 887].) If there are considerable "uncertainties affecting the vesting or maturation of the pension," then, according to *Brown*, the court "should not attempt to divide the present value of pension rights," and instead should award "each spouse an appropriate portion of each pension payment as it is paid." (*Brown, supra*, at p. 848, fn. omitted.) This requires the court to "continue jurisdiction to supervise the payments of pension benefits." (*Id.* at p. 849.)

Citing *Wilson* and *Bensing*, the *Brown* court further observed that the in-kind division of nonvested pension rights could be achieved in the same manner as division of vested pension rights—"by awarding each spouse a share in future payments." (*Brown, supra*, 15 Cal.3d at p. 849.) Notably for present purposes, and as the parties agree, the court in *Brown* did not endorse or employ a specific formula or method of in-kind pension division, instead remanding the case for an equitable division of Mr. Brown's pension rights, whether accrued or not at separation. (*Id.* at p. 852.)

■ Thus, the general principles that can be distilled from *Brown*, and for which it is most often cited,[17] are the notions (1) that even though pension rights are nonvested or unmatured at separation, they are property that is subject to division and (2) that the trial court may achieve that division either

---

[17] See, e.g., *In re Marriage of Anderson* (1976) 64 Cal.App.3d 36, 40 [134 Cal.Rptr. 252]; *Judd, supra*, 68 Cal.App.3d at pages 520–522; *In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 422, 426 [174 Cal.Rptr. 493, 629 P.2d 1] (*Gillmore*); *Hug, supra*, 154 Cal.App.3d at pages 789–790; 791; *In re Marriage of Bergman, supra*, 168 Cal.App.3d at pages 749, 756–757; *In re Marriage of Frahm* (1996) 45 Cal.App.4th 536, 544 [53 Cal.Rptr.2d 31]; *Lehman, supra*, 18 Cal.4th at pages 177–180, 183.

by cashing out the nonemployee spouse through reduction of the rights to present value (requiring costly expert testimony and risk assessment about the probabilities of future vesting or maturation) or by retaining jurisdiction to achieve division later as the pension benefits accrue and become subject to payment.[18] On the face of it, *Brown* did not either establish or promote the use of the time rule, or any other specific formula, as a method for the ultimate pension division on the court's exercise of its retained jurisdiction.

Within months of the *Brown* decision, *In re Marriage of Freiberg* (1976) 57 Cal.App.3d 304 [127 Cal.Rptr. 792] (*Freiberg*),[19] which had been remanded in *Brown*'s wake, was decided. This case involved the division of a military pension in which none of the benefits could be said to have accrued prior to husband's actual retirement, which occurred postseparation. The court was faced with either awarding the entire pension to husband on the theory that it had been earned only after the marriage had ended or dividing the pension based on the extent to which the service that was used to determine the benefit at retirement was performed during the marriage. In light of *Brown*, and relying on *Waite, Wilson, Bensing,* and *Martin,* the *Freiberg* court concluded that the "apportionment of retirement rights between separate and community estates may be made upon the basis of the number of years of service during marriage, on the one hand, and the number of years of service before marriage and after separation, on the other . . . ." (*Freiberg, supra,* 57 Cal.App.3d at p. 310, citations omitted.) Because the right to the pension flowed from the services provided during employment, not from his rate of pay on the day of his retirement, "[t]he fact the husband's basic pay at the time of retirement would be his separate property is alien to the retirement rights of the parties [*Waite, supra,* 6 Cal.3d at p. 471]." (*Id.* at p. 311.)

Thus, although *Waite* involved benefit characterization and not apportionment, its underpinning that postretirement compensation rates are irrelevant to benefit characterization was transformed in *Freiberg* into the broader

---

[18] The court in *Brown* also clarified that it did not prefer the cash-out method, something that had been attributed to it by a prior suggestion in *Phillipson v. Board of Administration* (1970) 3 Cal.3d 32, 46 [89 Cal.Rptr. 61, 473 P.2d 765], a case overruled by *Brown.* (*Brown, supra,* 15 Cal.3d at pp. 851, 848, fn. 10 ["Our suggestion in [*Phillipson, supra,* 3 Cal.3d 32], that when feasible the trial court should award the employee all pension rights and compensate his spouse with other property of equal value, was not intended to tie the hands of the trial court. That court retains the discretion to divide the community assets *in any fashion which complies with* . . . *Civil Code* [former] *section 4800* [see now generally section 2550]." (Italics added.)].)

[19] Later overruled in *Gillmore, supra,* 29 Cal.3d at page 425.

notion that an employee's changing compensation while still in service is also irrelevant to apportionment. In other words, the qualitative aspect of each service year as measured by its associated level of compensation has no effect on the final benefit as apportioned, equalizing all years of service regardless of rate of pay. This is the essence of the time rule, as it is currently understood, a point not discussed in *Brown* or necessarily inherent in its holding.

Shortly after *Freiberg*, the time rule was extended from military retirement plans to private industry plans (*In re Marriage of Anderson, supra*, 64 Cal.App.3d at pp. 39–40), to city government plans (*In re Marriage of Adams, supra*, 64 Cal.App.3d at pp. 186–187), and then to all plans in which years of service is a "substantial factor" in computing the benefit formula (*Judd, supra*, 68 Cal.App.3d at pp. 522–523). Not one of these cases cited *Brown* specifically for their application of the time rule or referred to the time rule as the "*Brown* Formula." The court in *Judd*, in applying the time rule, even observed that "[s]uch disposition would comport with what we have termed the 'time rule.' [Citation.] [¶] This method of ascertaining the community interest in a spouse's retirement benefits has been approved not only by pre-*Brown* decisions dealing with vested pension rights [citations], but by post-*Brown* decisions under which the trial court retains jurisdiction to supervise payments as they are received." (*Judd, supra*, at p. 522.)

And over the years (but especially for present purposes in the 1980 time frame of the interlocutory judgment in this case), these three cases and *Freiberg*, as opposed to *Brown*, have been most frequently cited in published opinions to explain, discuss, or support application of the time rule. (See, e.g., *Poppe, supra*, 97 Cal.App.3d at pp. 8–9 [strict time rule not applied where amount of pension benefit is not substantially related to years of service but instead to points earned as a result of service, which varied over the years]; *Hug, supra*, 154 Cal.App.3d at pp. 784, fn. 2, 787–788; *In re Marriage of Jacobson* (1984) 161 Cal.App.3d 465, 475 [207 Cal.Rptr. 512]; *In re Marriage of Bergman, supra*, 168 Cal.App.3d at pp. 750, 759; *In re Marriage of Henkle* (1987) 189 Cal.App.3d 97, 99, fn. 3 [234 Cal.Rptr. 351]; *Gowan, supra*, 54 Cal.App.4th at pp. 88–91; *Lehman, supra*, 18 Cal.4th at pp. 176, 179, 187–188 [nonemployee spouse who owns community interest in retirement benefits owns a community interest in those benefits as enhanced by conditions or events occurring after separation or dissolution since right is one to income stream that begins to flow, and is defined, at retirement]; *In re Marriage of Bowen* (2001) 91 Cal.App.4th 1291, 1295 [111 Cal.Rptr.2d 431] (*Bowen*).)[20]

---

[20] Our research also tells us that at least three current family law treatises appear to contain no reference to the time rule as either the "*Brown* Formula" or the "*Brown* rule." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2007) ¶¶ 8:1115 to 8:1150, pp.8-263 to 8-279; 1 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2006)

We acknowledge that in 1988, some eight years after the filing of the interlocutory judgment in this case, the court of appeal in *Zarrahy v. Zarrahy* (1988) 205 Cal.App.3d 1, 5 [252 Cal.Rptr. 20], a civil partition action, used the term *"Brown* Formula" in quoting from the record below and in referring to the remedy the plaintiff was seeking. At issue there was whether family law principles could be applied at all in a partition action to the division of a pension, which had inadvertently been omitted from the earlier marital dissolution judgment. Not at issue was whether the term *"Brown* Formula" was synonymous with the time rule as an apportionment method. The reference to the *"Brown* Formula" there did not even necessarily imply or endorse use of the time rule, but rather described the notion of a *"Brown* formulation order," which would require valuation of the community property interest in the pension at the time the benefit became payable instead of at the time of the earlier dissolution, a concept expressly endorsed by *Brown's* in-kind division through the court's reservation of jurisdiction over pension rights until they become payable in the future. (*Ibid.*)

Similarly, in 1997, some 17 years after the judgment in the instant case, the California Supreme Court, quoting from the 1983 interlocutory judgment of dissolution at issue in *In re Marriage of Oddino* (1997) 16 Cal.4th 67, 72 [65 Cal.Rptr.2d 566, 939 P.2d 1266] (*Oddino*), made reference to " 'the formula in *Brown.*' " But there again, it is not apparent from that case or its holding, which had nothing to do with this reference in the underlying interlocutory judgment, that the court was endorsing the use of the time rule or equating that rule with the *Brown* decision.[21]

---

§§ 21:40–21:43, 22:25, pp. 21-74 to 21-90, 22-34.7; Cal. Civil Practice: Family Law Litigation (2003) §§ 6:35 to 6:43.) Indeed, one of these treatises refers to the *"Brown* principle" not as the time rule but instead as the notion that "an employment benefit is community property to the *extent it accrued during marriage and before separation.*" (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:190, p. 8-56.4.) The same treatise describes the *"Brown* 'time' approach" as a "focus[] on whether the *right to the benefit accrued during marriage and before separation,*" not on the specific time rule method of apportionment. (*Id.*, ¶ 8:191, p. 8-56.4.)

[21] *Oddino's* essential holding was that ERISA does not preempt state law plan joinder statutes (*Oddino, supra,* 16 Cal.4th at p. 82) and further, benefits payable under a QDRO are limited to the present value of benefits actually accrued (and scheduled to commence at the normal retirement age or the actuarial equivalent) without taking into account the present value of any employer subsidy for early retirement. The nonemployee spouse in that case was therefore not entitled under the QDRO to the benefits of the early retirement program known as the "Rule of 75," an employer subsidy for employees aged 55 or older whose age and years of service add up to 75, if the employee spouse elected to continue to work. (*Id.* at pp. 82, 88.)

And in 2001, the Court of Appeal in *Bowen, supra,* 91 Cal.App.4th at page 1299, quoting from the 1984 judgment below in that case, also used the term "*Brown* Formula," the judgment there referring to the time rule by this reference. But then the court went on to parenthetically describe that "formula" as the more general *Brown* holding that "to the extent pension rights derive from employment during marriage, they comprise a community asset subject to division." (*Ibid.*) While we can observe that the 1984 underlying judgment in *Bowen* expressly correlated the term "*Brown* Formula" with the time rule, we cannot say that this single instance then connoted a generally accepted association or demonstrated a universal meaning of the term, especially one that could be made retroactive to 1980, the year of the interlocutory judgment in this case.

The trial court in its written order found here that the parties had in 1980 "entered into a stipulated Interlocutory Judgment."[22] That stipulated judgment, which represents an agreement, thus must be analyzed and interpreted in light of the parties' mutual intent and according to statutory requirements for the interpretation of contracts, including those set forth in Civil Code sections 1636, 1637, 1638, 1644, 1647, 1648, 1649, and 1655. (*Gowan, supra,* 54 Cal.App.4th at p. 87.) We have concluded that the reference in the 1980 judgment to the "*Brown* Formula" is less than clear, given the actual holdings of *Brown* and its effect on the law as well as our survey of the evolution of the time rule.

The record reveals that the parties initially stipulated to "distribution of [IBEW] retirement fund reserved" and that no one requested the court to later divide the pension benefits expressly per the time rule or any other specific method of apportionment. James understood the stipulated judgment to mean simply that "the community . . . interest would be based on the benefits earned during the marriage (plus any enhancement to [his] pension due to community years) then divided equally."

Mary Ann, for her part, could only say that she had no specific understanding of the "*Brown* Formula" at the time of the stipulated judgment but that

---

[22] This, despite that the actual interlocutory judgment has a box checked to indicate that the proceedings had come on for "contested hearing." We agree with the trial court's order and James's contention that the record here supports that the court's earlier treatment of the pension was pursuant to stipulation, notwithstanding the checked box on the judgment form, which may have been referring to other issues that had been or remained in dispute between the parties.

she did understand that she had been awarded "an equitable share of [James's] pension benefits and that [her] share would stay in the plan to grow and mature until [James] retired."

Both of these understandings are perfectly consistent with the principles for which *Brown* stands—(1) that pension rights that derive during marriage, whether or not vested, represent a community property interest subject to division; and (2) that in-kind division may be accomplished by the court's retention of jurisdiction and later implementation of the division as benefits become payable. (*Brown, supra*, 15 Cal.3d at pp. 841–842, 844–849, 851.) And neither understanding dictates that the term "*Brown* Formula," as used in the 1980 interlocutory judgment, be interpreted as requiring application of the time rule.

Instead, in light of the record and the parties' expressions of their intentions when entering into the stipulation, as well as *Brown* itself, this reference is more readily understood to mean that James and Mary Ann agreed that the pension rights that derived during their marriage, whether or not vested, were community property and that these rights were subject to later in-kind division, with the court retaining jurisdiction over the pension to later implement that division. Rather than being cashed out based on then present value, one of *Brown*'s alternatives, Mary Ann agreed to bear the risk that the pension would not fully mature whether by James's premature death or termination of employment. James likewise agreed that Mary Ann would enjoy any increases in value to his pension rights derived during their marriage, including upward changes to the plan formula that might increase or enhance that benefit. And the language of the judgment, even with its ambiguous reference to the "*Brown* Formula," confers no more and no less.

■ Thus, contrary to the trial court's construction of the judgment, that judgment's treatment of the pension requires the exercise of judicial discretion to apportion community and separate property interests, by selecting an appropriate and equitable method of apportionment based on the particular facts and circumstances of this case, and to divide the community interest in the benefits equally between the parties. The court's failure to exercise that discretion by its equating the term "*Brown* Formula" as used in the 1980 judgment with the strict time rule as the chosen method of apportionment constituted an abuse of discretion.

## DISPOSITION

The order providing for apportionment of James's defined benefit pension per the time rule is reversed. The matter is remanded to the trial court with directions to exercise its discretion to equitably apportion the defined pension benefits and divide the community interest in accordance with Family Code sections 2610, subdivision (a), and 2550. We express no opinion on the proper method of apportionment, i.e., per the time rule or any other particular formula.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.